Thank you. Good morning. May it please the court. I'm Ginger Odom for Robert Montijo. We presented two issues on appeal, one involving the ineffective assistance of counsel and the other involving the 15-year add-on. With the court's permission, I'd like to focus on the first issue and briefly touch on the second if time remains. Is that all right? Okay, thank you. This trial was supposed to be about whether Robert Montijo committed a home invasion and whether he had a gun. Instead, it was a visit from the ghost of Robert's arrest, booking, and fingerprinting on unrelated charges seven years earlier, that his prints were contained in a law enforcement database called APHIS, that that database APHIS was for known offenders, and that his DNA was contained in a database called CODIS, and that Montijo was in violation of a court order by refusing to provide a buccal swab in this case. The state reminded the jury in its closing rebuttal argument that Montijo was printed seven years earlier, that his prints in this case were compared to a print card taken from 2003, and that the one print here on an envelope, a latent print on an envelope in this case here, was matched to a print taken from him seven years earlier. None of this had any bearing on the charged conduct of home invasion, and it prevented the jury from hearing the evidence related to home invasion dispassionately. The Illinois Supreme Court in Thingol recognized that past misconduct is not admissible, because the jury may convince the defendant not because the state establishes every element of the crime beyond a reasonable doubt, but because the jury feels as if the defendant is a bad person with a propensity to commit crime. Here, the jury was told repeatedly that Montijo was a bad person deserving of punishment through the state's irrelevant and prejudicial information. First of all, at the trial for the 2010 robbery here, the jury was told without objection from the defense lawyer that Montijo had a criminal past through the testimony of Deputy Horstman, who testified that Montijo was arrested as an adult seven years before the incident here, that he was booked then in 2003, and that his prints were taken by the police at that time. Then, in closing rebuttal argument, the state reminded the jury that Montijo had been printed seven years earlier, that the prints in this case were compared to a print card taken from him in 2003, and that, as I mentioned, that the one latent print on an envelope here matched to a print taken from him seven years earlier. There was no reason in the world for the jury to learn that Montijo was arrested, booked, and printed in 2003, and yet the lawyer made no objection to this. In addition to the prior criminality evidence, there was also evidence about APHIS and CODIS. The Illinois State Police print examiner testified, Ms. Lisa O'Daniel, testified that she got a match to Montijo from APHIS and that she then requested an inked fingerprint from Montijo, and that print also matched the latent print found on the envelope recovered from the apartment. Just after that, Illinois State Police examiner D. Cross took the stand and said that she was also a latent print examiner, and that when she has an unknown print, she can compare it to a database of known offenders or the known database, which she called APHIS, and that tied up, you know, that APHIS is a database of, at least sometimes, of known offenders. In any event, it put into the jury's mind that APHIS is for known offenders and that Montijo's fingerprint was in this database of known offenders. After that, the jury learned that Montijo's DNA was also in a database called CODIS, and the jury learned that this database is called CODIS because defense lawyer asked the detective who was testifying about the DNA evidence whether  it was CODIS. And then the jury had been told in opening statements that Montijo also had violated a court order by refusing to provide a buccal swab, which also added to this idea that he was a bad person, that he was a scofflaw and recalcitrant, and that he was just a bad guy deserving of punishment. Now, after opening statements, the judge did bar any evidence of that. Yes, sir. On the second day of trial, the trial lawyer asked for a motion in limine, and eventually the trial court agreed and decided not to let the state bring that evidence in. And no evidence of that was introduced? No evidence that he refused. The state told the jury that the witness named Jeff Burich was the one who went to go get the buccal swab, but that the defendant refused and that he continued to refuse. They said that in opening statement, but that testimony was not allowed. Right. And I take it the jury was instructed that opening statements are not evidence. That's correct. All I was going to say is that Jeff Burich did then testify that he took the buccal swab from Mr. Montijo. So, again, the only issue in this case was whether Montijo was the intruder inside the apartment and whether he had a firearm. His prior arrest did not properly help the jury decide these questions, neither did the fact that he had previously given fingerprints, that his fingerprints were in APHIS or that his DNA was in CODIS. On the contrary, evidence that Montijo had been previously arrested, booked, and his prints taken, and that his fingerprints were in APHIS and that APHIS was a database for known offenders, prejudiced Montijo by suggesting that he was a bad person with a propensity to commit crime. Defense counsel failed to keep this evidence from the jury, to object to it when it was introduced, or to even strike it from the record, and he himself actually elicited the evidence himself. His failings prejudiced Montijo, and based on the foregoing, we respectfully request that this court reverse his conviction and remand for a new trial. Now, I'd just like to briefly touch on firearm. Here, the firearm, the state failed to prove that Montijo was guilty of being armed with a firearm during the offense because there was no evidence introduced at trial that the object in his hand was actually a firearm, that it met the statutory definition of a firearm. This form of home invasion with the firearm carries with it a very hefty sentence. The sentence of 6 to 30 years without the firearm, and then a mandatory add-on of 15 years if a person is armed with a firearm. And whether or not a gun is a firearm is precisely defined by statute, and some items are excluded from that statute. If we were to accept your argument about the firearm, I mean, how could the state, in any case, in which there are a lot of cases where what appears to be a firearm is brandished, pointed at somebody, but there's no overt way of knowing that it actually is a firearm, how would the state ever prove that it was a firearm in those cases? Well, and the state has proved that in other cases, like in the Howley case. I mean, it depends on the circumstances. You can get lucky and actually recover it, you know, but in any case where it gets tossed or whatever. Well, and for example, in the Malone case, the state did not have the firearm, but there was unequivocal testimony that that person was able to identify the gun as a gun, and that there was additional evidence that the court relied on the additional evidence that there was a heavy clunking sound when the gun hit the counter and the woman turned around and saw that it was a gun on the counter, plus there was surveillance video, and so the judge was also able to see the object in the hand and make a determination that it was a firearm, and there was also a still from that video. So in those instances, even though a gun is not recovered, there can be additional evidence. For example, there might be evidence that the gun was fired. There could be bullets or gunpowder residue. There could be extrinsic threats, like I'm going to kill you or I will shoot you. There are cases that provide those additional elements, or in those cases where a witness has some experience with a gun or they are able to unequivocally testify because of their exposure to the item in the hand or because of their own exposure or knowledge base about guns and firearms, that they're able to make that determination. So really the point here is, I mean, I'd like to analogize to, in terms of a firearm being a gun or a gun being a firearm, I mean, for example, in geometry, Euclid had this axiom that every square is a rectangle, but not every rectangle is a square. And the way that you make a determination about whether or not a four-sided, four-angled, you know, parallelogram, so to speak, is an actual square is it has to fit certain criteria. That's exactly what's happened here. The legislature has decided that they want to give very heavy penalties for crimes that are committed with actual firearms. And in order to, and they have given a very specific definition. They've explained what a firearm is and they've explained what a firearm is not. And so for the state, I mean, where the state has elected, if they go forward on a case and they charge with a firearm and they want the 15-year add-on, then the courts have to hold the state to this high burden of proving that it's actually a firearm. I mean, where the statute considers several items and concludes that some are firearms and some are not, and therefore some would get this 15-year add-on and some would not, then it's incumbent on the state to prove that an item is what it actually purports to be. And here the state, the witness' testimony was equivocal. They described simply something that was black and square, which certainly fits a lot of guns that are not firearms. It may also fit firearms, but it fits, like, I mean, in the brief I showed you a picture of a BB gun that would certainly comport with that definition. And so the state failed to prove that this item in this person's hand was an actual firearm. And we're asking that this court strike that 15-year add-on from his sentence. Thank you. Thank you, Counsel. I'm going to turn you for a vote. Sharon Shanahan. May it please the Court. Counsel, my name is Sharon Shanahan and I represent the people of the state of Illinois. Defendant first claims that there was ineffective assistance of counsel in this case. And I think you can dispose of this case purely on the overwhelming evidence of guilt. If you don't go any farther, we have both victims testifying that they didn't know the defendant. They admitted he'd never been in their house. So there is absolutely no innocent explanation about how the defendant's fingerprint could have been on an envelope in their apartment. And yet there it was. Both victims testified that the man who invaded their home and held them at gunpoint had on a navy blue bandana folded into a triangle covering the lower part of his face. Minutes after the perpetrator fled, the victims found a navy blue bandana folded in a triangle just a few feet from the front door. So there's no... Was there testimony that it matched the same pattern or anything like that? Pattern? Yeah, I mean a bandana. I mean, was it just plain blue? They said navy blue. Navy blue bandana folded in a triangle. And a navy blue bandana folded in a triangle was found just feet outside their front door. And defendant's DNA was found on that bandana. So there's really no other. It defies the laws of probability to say that if a small point, because the defendant had his mask on, the most that the victims could say was that he was Hispanic and the defendant is Hispanic. So it defies the laws of probability to say that his... And yet his fingerprints are on materials in their apartment and his DNA is on a bandana exactly like the one the perpetrator used, found immediately after the robbery and immediately outside their door. There's just... And the only thing to counter that is defendant's live-in girlfriend who has... Basically she says, well, I know he was here. Well, how do you know he was here? Well, because he's always here in the morning. He always helps me with the kids. So since he always helps me with the kids, then he must have been there on this particular day, and not to mention her bias. So we can stop right there on ineffective assistance of counsel because there was no prejudice to the defendant. In any case, none of these claims, not the taking of the prior prints, the APHIS, or the CODIS, was wrong. In People v. McGee, the court noted that the mere inference that the defendant had committed some offense in the past without some suggestion as to the nature and circumstances of that offense fails to overcome the obvious probative value that the defendant's prior arrests connected them with the crime. And they said, and here I'm quoting, it may well be that defendant's fingerprints were on an arrest card at the police department as a result of some minor offense or because of his failure to postpone on a traffic offense. Without any further indication as to the basis for his fingerprints on an arrest card, there is insufficient evidence of defendant having committed a prior criminal offense. I would also note that this was infinitesimal testimony. So one, very small, couldn't have affected the outcome. And two, wasn't wrong. Moving on to APHIS. What do you mean when you say it wasn't wrong? There was no error in allowing testimony of this prior. I don't know if you're saying it wasn't incorrect information. It was correct information. It was correct information, and it was also all right for him to say that. Moving on to APHIS, I point out in the state's brief a very significant, at least I believe it to be a very significant, typographical error in the defendant's brief because the defendant says that Officer Cross compared latent prints that she found to known offenders to our known database called an APHIS system. And that is not what Officer Cross said. She said to known offenders or to our known database called an APHIS system. Now, I think there's a really big difference between those two statements. A known database is all known fingerprints. And I spent much more time than I probably needed to wandering around through the statutes looking for all the people that need to give their fingerprints. And the only thing that surprised me was that I didn't have to do that. Lots of people get fingerprinted for lots of reasons, and probably the biggest one is jobs. So the fact that someone's an APHIS doesn't mean that they're a criminal. So she did not say to known offenders in a known offender database called APHIS. Let me just ask, as far as closing argument, as I understand it, this was not emphasized by the stated closing argument. Correct. In other words, they didn't stand up and say, and his fingerprints were found because he had a prior arrest or anything like that. No, you're not. Okay. Now, defendant says, well, there's another interpretation of Officer Cross's testimony that when she said to known offenders or to our known database called APHIS, that that could also mean known offenders. But then what does the word or mean? Or distinguishes two different things. It either means known offenders or it means APHIS, which is the known database, which is all known people that have been fingerprinted. And no one said APHIS was a database of known offenders. And as far as in defendant's reply brief, he says, well, nobody gave an innocent explanation to the jury. Well, in People v. Hopkins, the court said, surely one of the common experiences in life that many jurors have had or know about is that governmental agencies frequently fingerprint people seeking or obtaining employment. So nobody had to go tell this jury. Jurors are not required to leave their common sense at the door. They know that. They didn't have to be specifically told that. The only other mention of APHIS was State Police Agent Lisa O'Daniel, who simply said APHIS was an Illinois State Police database. All she said she didn't say was fingerprints. Defendant concedes that both Prewitt and Jackson say that it's okay to mention fingerprinting. So, again, there was nothing wrong with what happened here. There was no error in the admission of this testimony. Therefore, trial counsel didn't do anything wrong by not objecting to it. Moving on to CODIS, first of all, we have to consider procedurally how CODIS ever came to be mentioned here, and that is when Detective Kemp was talking about how this case went four months without them having a clue who committed this crime. And so it was only when they got this CODIS hit that they then said, okay, that matches this person, and now let's go talk to him. So this is a continuing narrative of the events of the defendant's arrest, and our Supreme Court has long held that it's not error to admit testimony of other crimes if it's part of a continuing narrative of the events surrounding the arrest of the defendant. People v. Jackson also, another Supreme Court case, says that it is not error to admit testimony that the defendant's DNA is contained in CODIS and that it matched a sample from the crime scene. Jackson, again, goes to this common knowledge that jurors have that CODIS contains several different indexes and not all of them are criminally based. And Jackson specifically noted that jurors, in light of their own observations and experiences in life, could infer that a defendant's DNA profile might be contained in a state database for medical reasons, like transplant recipients, blood donors, genetic testing. So, again, there was no error, therefore there's nothing wrong with not objecting to it. And since there was nothing wrong with mentioning any of these three things, there can't be any cumulative effect of admitting them. Again, I tried to point this out as clearly as possible in our brief, this snowball effect of the initial typographical error of leaving out that word or, which then got compounded by putting this language into someone else's testimony when they didn't testify about known offenders at all. The testimony about CODIS had nothing. Simply, he said that they checked his DNA and the defense counsel said, was that in CODIS? Yes. That's it. That's all. And yet, by the time this is all said and done, we have all of these people who are attributed to having said that his fingerprints were known offenders, that his DNA was known offenders, and there simply was no testimony on that. Regarding the buccal swab, this is purely trial strategy. Although defense counsel disagrees with me, I see no reason why this defense attorney should expect this to happen. Defense counsel refers to this as a pitched battle and the most litigated point prior to trial. Well, the defendant was just being stubborn and contemptuous. The only pitched battle was that the defendant just kept refusing to submit to the swab. It wasn't a legal battle. It was some, I think there were three occasions when the judge said you have to submit and he didn't want to have Carbondale police do it. He wanted to have the Illinois State Police do it. That's all it was. It was not a legal point that they were battling over. And so I think it is quite reasonable for defense counsel to have not expected this to come up in oral argument. It really is not a very important point. He files the motion in limine, the very first thing the next morning. And it's denied. So then they have a lengthy testimony of Ms. McDaniel, I believe it was. And then the judge says, you know what, I've been thinking about that and I changed my mind. Well, I think it's extremely reasonable not to call attention to prior statements, especially that long after they happened, and especially when you've got a jury that's instructed that opening arguments are not to be considered as evidence, and especially when you've got if this hurt anybody it hurt the state. That's what the trial court pointed out was that if this hurt anybody it hurt the state because they said they were going to present some testimony on this and then they didn't. So you take a statement that's made, opening arguments on, I don't remember what day this started, but we'll just say Monday morning. And on Tuesday afternoon the judge says, you know, I am going to not allow that. He's gotten what a really important thing, which is to not get the testimony itself brought in and to not bring the jury's attention to it by asking the judge, remember what he said a day and a half ago? Well, don't pay attention to it. I think it's certainly a reasonable trial strategy to have gotten the important win and just let it ride from there. Touching briefly on the second issue as to whether a gun is a gun, the defendant says that the testimony that this was a gun was equivocal and that it was just a square black thing. And that perhaps could be true of what Lindsay, one of the young women that said about the gun, but Jenna testified that he had a black automatic handgun. It was not a revolver. Now, did she say it was, I'm sorry, I just watched a James Bond movie last week, so I'm going to say it was a Walter PPK. No, she didn't say that. You don't have to testify that it was a .357 Magnum. You don't have to testify that it was, like I said, a Walter. I don't know that much about guns. I know what's a gun, though, and I know that the difference between a handgun and a revolver. So did Jenna. That's exactly what she said. She said it was a black automatic handgun. It was not a revolver. It didn't have a hammer. It was black. It was six or seven inches long. And she is viewing this thing at arm's distance. She said very close within hand-reaching distance. Lindsay, her roommate, corroborates her testimony. It's not as clear, but Lindsay says that the defendant was holding a black, square, six-inch gun. And here, again, she's corroborating that testimony. And then in this issue, the defendant says, well, he takes issue with the fact that the gun was never recovered, and I'm quoting from the opening brief, making it impossible to examine its physical properties to determine if it qualified as a firearm or if it was a BB or toy gun. Well, why couldn't that happen? Well, because the defendant ran off with that gun and got rid of it. That's not the state's fault. And therein lies the problem with the defendant's reliance on Ross. I cited to this court's decision in People v. Hawley, very, very similar. And Hawley says, again, I'm quoting, After the guilt of defendants was established by competent evidence, if they contended that the objects brandished by them were not pistols, revolvers, or other firearms within the purview of the statute, and they had them in their possession or control, it was incumbent upon them to produce such objects for evidence in order to disprove the state's evidence and support their defense. To place such a burden on the defendants is not offensive to their constitutional right to remain silent, nor does it represent a shift in the burden of proof for the state. And so we're not making defendant prove anything here other than if he says that wasn't a gun, that was a toy, and he has complete control over this object, then it's incumbent upon him to present some evidence that that was a toy. What the court was saying there basically is, like in this case, the evidence was he had a gun. That was the only evidence. And if the jury believed that beyond a reasonable doubt, they could convict him and find him guilty of being in possession of a firearm. But if they had contrary evidence, they could consider that. But in the absence of contrary evidence, the jury could, on that evidence, find beyond a reasonable doubt. That's basically what the court was saying. Yes, that's my interpretation of the case. Now, Ross was a different case. Because Ross, the gun was recovered by the police. They have it. They have it. It's described as a pellet gun. And the victim described it as a small, very portable gun, and she identified the pellet gun as the one used in the robbery. The police officer who testifies says that this is a 4.5 BB gun. It's a BB gun. Okay. And the state has it. In those circumstances, then, and they did not present the gun into evidence. Nobody ever saw the gun at trial. In those circumstances, you have a very, very different situation. And the court said the state needed to then prove that this really was a gun. Now, interestingly, Ross goes on to say, whether an object is sufficiently susceptible to use in the manner likely to cause serious injury is generally a question of fact. What you just said. Which is that when Jenna gets up there and says this was a gun, that it's a semi-automatic, that it's not a revolver, that it's black, that it's six inches, when that information is corroborated by her roommate, then it goes to the jury to decide which one of those is it. And this jury said it was a gun. They got a special instruction that asked them if they said it was a gun. Thank you. Ms. Shanahan, the total rebuttal? Yes, sir. In response to your question, was this prior arrest ever mentioned? It's incorrect. It was actually mentioned three times in the closing rebuttal by the state after the time when the defendant no longer had an opportunity to respond to it. The state said that Lisa O'Daniel has been doing fingerprints for 15 years. She took this fingerprint and she compared it to the defendant's print card. The state went on and then they came back to it. They said she matched the defendant's print to a print taken back in 2003. And then the state tied it up again with the prior arrest and his prior criminality by reminding the jury that Horstman took his prints in 2003, which was seven years before the issue at trial here. So, yes, there was some hay made of this mention of his prior criminality. There's another correction. The state has said that Lisa O'Daniel never mentioned what APHIS is. That's not actually true. She mentioned that she compared the prints to APHIS, and I believe in the record she explained that APHIS is a fingerprint database. And the point is that directly after her testimony that she found a fingerprint that matched Montijo in a fingerprint database, then D. Cross took the stand. And whether there's a comment in her comment or whether there is not a comment in her comment, I'll leave it to the court. You have the record. But what she said was that when she's a latent fingerprint examiner, if she finds a print of an unknown source, she can compare it to a database of known offenders or known database called APHIS. So it was completely unnecessary for D. Cross to say and prejudicial for D. Cross to say that APHIS is a database of known offenders. And that is what she said, and the record says that. Now, there may have been a comma. There may not have been a comma. The state's argument seems to suggest maybe there's two databases, one of known offenders and one of knowns. And the other point about APHIS is that there's no evidence in the jury that the jurors had an opportunity to spend a lot of time researching who all would go into APHIS. The state said that she spent a lot of time figuring out the donor recipients and medical reasons. There would be all kinds of reasons. The jury was not told about that. And so that point is interesting but not necessarily probative in this issue when what the jurors were told about APHIS was that it was a database of known offenders. Now, she said also that there was no prejudice here, but the prejudice is that they were told that he was a prior criminal. They were told that his fingerprints were in a database. They were told that a database was for known offenders. So when she mentions the snowball effect, that's exactly what the argument is, that they were told not just the one single mention that you pointed out in CODIS where there's no definition of what CODIS is and no inference other than combined with all this other evidence that he's a bad guy, he's a criminal, he has a propensity to commit crimes, and that he deserves punishment. So, yes, there was a snowball effect. And that snowball effect is the point of this argument that Mr. Montijo was denied the effective assistance of counsel when his lawyer let not one, not two, but all of these things slip past without objection. And I made that point about CODIS and Jackson. In Jackson, they make very clear that a single isolated reference, a mere mention of CODIS without more, is not prejudicial. It doesn't give any indication that CODIS is for a criminal database. That's not what happened here. We had the mention of CODIS. Like you pointed out, there wasn't a definition of CODIS, but that's not all we had here. We had a whole lot of other things. And so Jackson is not dispositive of this case because there was more than just a singular mention. As to Sirena Payne and whether or not the jury, whether or not she recalled it with specificity that day in question, the thing about Sirena Payne is she had four kids under the age of 10. They caught three different buses. And she said that she would remember if Mr. Montijo was not there because he's the one that got everybody up and made them breakfast every day. Now, I have only two kids in my house, and I know that when I don't have help, I remember the days that I don't have help versus the days that I do have help. When my husband helps me, it goes smoother. When he doesn't, it's terrible. It's chaos. And I can only imagine that in Ms. Payne's house, it would be complete chaos to have no help at all for four kids under the age of four when she's used to having the help. So that's why her testimony that he was there because otherwise she would remember him not being there does hold some weight. The mention of APHIS was not necessary. Certainly, Lisa O'Daniel, she did order an inked print from the Carbondale Police Department, which she got. And then she did the comparison. So thank you very much. We ask that you reverse this conviction and remand for a new trial or in the alternative, strike the 15-year add-on. Thank you very much. Thank you both for your briefs and arguments. Please take the matter under advisement and render its opinion during recess until 9 a.m. tomorrow. All rise.